| | |
|---|---|
| DARLA WARNKE,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 3:23-cv-00002-GMS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to Fed. R. Civ. P. 52(a), the Court hereby makes its findings of fact and its conclusions of law in the above case:

**FINDINGS OF FACT**

1. Plaintiff, Darla Warnke, has lived in Alaska her entire life. She has lived and worked in Anchorage, Alaska for 25 years. As part of her job duties from 2010 to 2023, Plaintiff went to the post office at 5855 Lake Otis Parkway in Anchorage twice a week—on Tuesdays and over the weekend.

2. On Tuesday, February 11, 2020, she followed her routine, leaving her work location at 4:00 PM to go to the post office. On that day, between 4:00 and 4:30 PM, Plaintiff slipped on ice on the sidewalk in front of the post office's entrance. The sidewalk and parking lot, which are routinely accessed by the public, were under the control of the United States Postal Service ("USPS").

3. It was between twelve- and thirteen-degrees Fahrenheit, and Plaintiff noticed that the parking lot was a little messy—with snow and ice and ridges of both—so she crossed

it very carefully. She had encountered snowy and icy conditions at this post office before. Knowing that pedestrians generally need to be careful where they walk during Alaska winters, Plaintiff walked slowly through the parking lot, taking small steps "like a penguin."

4. Once she was on the sidewalk, which was much better maintained than the parking lot, Plaintiff stopped walking cautiously and did not watch her step; instead, she focused on the door. After taking several steps on the sidewalk, she felt her feet slipping. She fell on her bottom, landing in a seated position with her feet out in front of her, pointing away from the door. Both of her wrists were fractured during the fall, becoming visibly deformed and compact. (Pl.'s Ex. 2 at 7-8).

5. A passerby helped Plaintiff into the post office, found her a place to sit, and called Plaintiff's sister, Denise Barengo, on Plaintiff's behalf. Mrs. Barengo and her husband Richard Barengo arrived at the scene fifteen or twenty minutes later. Within forty-five minutes of the accident and just before driving Plaintiff to the hospital, Mr. Barengo took a picture of the area where Plaintiff fell. (Pl.'s Ex. 1).

6. The photograph shows a sidewalk that leads to the post office's front door, bordering the parking lot. (*Id.*). Towards the bottom of the photograph, a patch of ice is visible on the largest section of concrete. (*Id.*). Around this patch, residue of ice melt product appears to show that the ice has considerably retreated from its largest extent—near the edge of the sidewalk—down to its extent at the time of Plaintiff's fall—where the residue aligns directly and closely with the remaining ice. (*Id.*). Moving upwards in the photograph, the ice narrows slightly into a path of patchy ice, trailing along the sidewalk's middle seam before angling left towards the post office's front door. (*Id.*). There are appreciable areas of dry concrete to either side. (*Id.*).

7. The government offered testimony that the dark spots on the sidewalk were water or damp concrete, not ice. But the great weight of the evidence demonstrates that the dark patches in the photograph are ice and that there is an appreciable amount of it on the sidewalk where Plaintiff fell. In light of the appearance of the photograph; the

freezing temperature at the time of the fall and throughout the day before; the testimony of the Plaintiff, her sister and brother-in-law, and the government's civil engineering expert; the post office winter maintenance log; and ice melt residue, which shows where the ice had previously receded, the Court finds that there was ice on the sidewalk. (Pl.'s Ex. 1; Def.'s Ex. H at 15-17; Pl.'s Ex. 9 at 1).

8. This same evidence—particularly the weather reports and maintenance log—tends to demonstrate that the ice had been on the sidewalk for some time.

9. As to the weather reports, there was trace precipitation at Elmendorf Air Force Base[1] in Anchorage on the second, fourth, and fifth of February 2020. (Def.'s Ex. H at 23). The records further indicated 0.08 of an inch of both rain and snow on the eighth, trace precipitation on the ninth, and no precipitation on the tenth or eleventh. (*Id.* at 7, 23). On the ninth, the high temperature was forty-one degrees with a low of thirty-three degrees. (*Id.* at 15-16). On the tenth, the average temperature was twenty-three degrees—with a high of thirty-four degrees and a low of thirteen degrees. (*Id.* at 16-17). The above freezing temperatures on the tenth lasted less than two hours before dropping into freezing temperatures, which only grew colder throughout the day. (*Id.*). Although the high temperatures on the ninth did not melt all the snow surrounding the sidewalk, presumably there was at least some melting. Given the freezing temperatures on the tenth—even when factoring in the period of several hours that it takes for the concrete's mass to adjust to match ambient temperatures—there was likely refreezing. On the eleventh, the day of Plaintiff's accident, the temperature never rose above sixteen degrees. (*Id.* at 17). What refroze earlier remained frozen all day on the eleventh.

10. As to the maintenance logs, the building's custodian—who has since passed away—last recorded winter maintenance on any part of the postal property on February 6, five days before the accident. (Pl.'s Ex. 9 at 1). The custodian shoveled the sidewalks on the fourth, but not on the second or fifth. (*Id.*). On February 6, he did not lay

---

[1] The government's civil engineering expert testified that Elmendorf is located approximately five miles north of the post office where Plaintiff was injured.

- 3 -
Case 3:23-cv-00002-GMS    Document 68    Filed 10/08/25    Page 3 of 20

down ice melt product, but he did use the snow shovel and the snowblower on the walks and loading dock. (*Id.*). His successor, Julie Spradling, who began working at the post office after Plaintiff's accident, described the custodian as "meticulous" and noted that it was important for the sidewalk to be safe for those coming in and out of the building. She further testified that she would have added more ice melt product to the area, particularly if it felt slick. Regardless, she was not present during the time in question and has no knowledge of what maintenance her predecessor performed or of what he did with respect to the log. There is, nevertheless, no record of any winter maintenance for the five days leading up to Plaintiff's injury. (*Id.*).

11. Though there is little evidence of maintenance, Mark Nordstrom, the government's expert in civil engineering, testified that the sidewalk was in a reasonable condition and that USPS complied with industry standards for best practices. He did testify that there appeared to be some ice in the photograph but stated that it was not an unreasonable accumulation. Nordstrom noted the ice melt residue on the sidewalk but testified that he could not say what type of ice melt product it was, when it was applied, how long it remained active, or whether the dark spots were ice or water; further, he acknowledged that if there was ice, any ice melt product previously applied was no longer effective.

12. Nevertheless, although the Court finds that there was patchy ice down the middle of the sidewalk area, it also finds that the ice and its extent were apparent in the daylight at the time of Plaintiff's accident.

13. Plaintiff indicates that she slipped on the smaller area of patchy ice aligned with the back tire of the car that appears in the upper half of the photograph. (Pl.'s Ex. 1).

14. Plaintiff was wearing flat, slip-on, tennis shoes, which did not have good traction and were unsuitable for walking in slippery conditions. (Pl.'s Ex. 2 at 7). Plaintiff's brother-in-law, Mr. Barengo, testified that he does not understand why people wear tennis shoes—like Plaintiff's—during an Alaska winter.

15. Plaintiff acknowledges a dry path of two-and-a-half feet on the right side of the

sidewalk and another dry portion of somewhat less than two feet on the left side of the sidewalk. She acknowledges that for February in Alaska the sidewalk was "pretty clear" and that she could have walked on the clear path to the right and arrived safely at the post office if she had been paying attention. Further, each of the Barengos testified that they would have walked on the clear path to the right. Indeed, Mrs. Barengo acknowledges that an average Alaskan would notice the patches of ice and easily navigate around them.

16. Once Plaintiff was in the emergency room, she began to feel acute pain in both of her wrists and, ultimately, underwent surgery for both wrists on February 12, 2020. A surgeon placed a pin into the back of each of Plaintiff's hands and another pin halfway along each forearm, before attaching external fixator frames to the portion of the pins which protruded from Plaintiff's skin. (Pl.'s Ex. 2 at 8; Pl.'s Ex. 3 at 2). The surgeon described this surgery to Plaintiff as providing the highest likelihood of optimal healing, with the fixators stabilizing the injury and preventing movement. The placement of the pins left permanent scars on two places on both of her arms. (Pl.'s Ex. 2 at 2-5, 8).

17. Plaintiff wore the fixators for six weeks. For the first couple of weeks, Plaintiff's use of her arms was strictly limited, such that she could not shower. Instead, one of her sisters or her niece had to help her take baths with plastic bags over her arms to keep them dry. Even after this two-week period, Plaintiff could not shower on her own and remained dependent on her family for every aspect of personal care.

18. Although the fixators were not uncomfortable or painful, they did hinder Plaintiff's life. Though she was able to move and encouraged to use her fingers, she could not drive, lift more than a couple of pounds, or do any of her hobbies—crafting, crocheting, knitting, quilting, and gardening. She went back to work quickly after her injury as the fixators allowed her to type, and she makes no claim for lost wages.

19. After six weeks, Dr. Graham Milam, an orthopedic surgeon specializing in hand surgery, removed Plaintiff's pins and external fixators. (Pl.'s Ex. 4). Upon removing

the fixators, Dr. Milam applied bandages, which Plaintiff wore for two weeks, and then fit her for wrist braces, which she wore for six weeks. Once Plaintiff had the braces removed, she was able to shower by herself and began weekly occupational therapy to improve her range of motion and strength. The therapy helped with her range of motion in her wrists, but she did not regain strength in her fingers.

20. Her fractures healed well, within the usual timeframe for this type of injury, and most of Plaintiff's pain from the fractures ceased within the calendar year. The only pain that Plaintiff reported during 2020 were periodic "ghost pains" along the side of her forearm opposite of where the fixators had been installed.

21. Sometime near the end of 2020, however, Plaintiff began to feel stiffness in her hands, which has since progressed. (*See* Pl.'s Ex. 6). Dr. Milam diagnosed Plaintiff's hands with stenosing tenosynovitis, known as "trigger finger syndrome." (Pl.'s Ex. 5 at 1, 2). This common condition is caused by inflammation within the tendon sheath along the palm so that the fingers become stuck in a bent position.

22. While testifying, Dr. Milam expressed no opinion as to whether Plaintiff's wrist fractures caused her trigger finger. He stated that trigger finger is not a typical complication of wrist fractures; most patients who have wrist surgery neither develop trigger finger nor have persistent pain or disfunction after their injuries, aside from joint stiffness. The government's independent medical expert, Dr. Donald Schroeder, however, found that Plaintiff's severe wrist fractures were the substantial cause of her trigger finger, regardless of the incidence of the condition in similarly situated patients. (Def.'s Ex. L at 5-6).

23. Since diagnosing Plaintiff, Dr. Milam has used conservative and surgical treatments for her hands. Conservative treatments included rest, oral anti-inflammatory medication, and a course of corticosteroid injections, each of which provided only temporary relief. On March 4, 2022, Dr. Milam performed a "trigger finger release," which involves small incisions through the palm to create more space for the tendons to move. (Pl.'s Ex. 5 at 1, 2). The surgery helped with Plaintiff's mechanical,

objective symptoms, but did not resolve her subjective symptoms. Dr. Milam has since administered additional steroid injections, which each provided some relief; this course of treatment is not sustainable, however, because continued use risks tendon rupture.

24. Because Plaintiff's symptoms have persisted despite the usual treatments, Plaintiff's daily activities continue to be affected by her trigger finger. At work, Plaintiff is less efficient; she or a co-worker must double- and triple-check her data entry. At home, Plaintiff has not been able to enjoy her hobbies, which used to occupy hours of her time. Although she returned to gardening as soon as she was able, she cannot maintain her garden to her usual standards. While she used to be a prolific and elaborate quilter, she has only made one, simple quilt since her injury. Crocheting and knitting remain impossible. During the holiday season, Plaintiff has been unable to uphold her family traditions, such as hosting Thanksgiving and creating intricate Christmas decorations.

25. As for any future treatments, Dr. Milam indicated that most cases of trigger finger involving recurrent episodes of significant swelling are treated with rest and adaptation or accommodation of the patient's lifestyle to the limitation imposed by their condition. While there is a reasonable, surgical treatment option for Plaintiff's trigger finger—a resection of one of the tendons that runs along the forearm and into the palm—Dr. Milam could not say that the procedure is medically necessary or if it would even improve Plaintiff's quality of life. He noted that the surgery would be complex, extensive, and require a long recovery. As such, he would not perform the surgery without further objective medical evidence to support the need for resection, including the possibility of the procedure being beneficial. Similarly, Dr. Schroeder found that any additional treatment for Plaintiff's trigger finger would be elective. (Def.'s Ex. L at 3, 6).

26. The total amount of Plaintiff's billed medical expenses for her wrist injury are $113,993.39. (Def.'s Ex. M at 5). The total amount of Plaintiff's billed medical expenses for her trigger finger treatment is $38,373.90. (*Id.*). In sum, the billed

- 7 -
Case 3:23-cv-00002-GMS    Document 68    Filed 10/08/25    Page 7 of 20

medical expenses for Plaintiff's relevant treatments total $152,367.83. (Def.'s Ex. M at 5). Plaintiff testified, however, that a portion of her medical expenses were covered by her Indian Health Services ("IHS") benefits, through which the United States provides health care services. The parties have stipulated that the amount paid by IHS for Plaintiff's wrist and trigger finger injuries is $3,524.64. Accounting for the IHS payment, the available economic damages for past medical expenses are reduced to $148,843.19.

## CONCLUSIONS OF LAW

1. Plaintiff brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. The FTCA provides that Plaintiffs may recover money from the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant." *Id.* § 1346(b)(1).

2. Liability is determined by the law of the state where the incident occurred—in this case Alaska. *Id.*

3. To recover under Alaska tort law, a plaintiff "has the burden of showing [1] that the defendant owed [her] a duty, [2] that the defendant breached that duty, [3] that [she] was injured, and [4] that the breach of duty was the proximate cause of [her] injury." *Edenshaw v. Safeway, Inc.*, 186 P.3d 568, 571 (Alaska 2008).

   **A.    Duty & Breach: Premises Liability Standards**

4. The existence of duty is a question of law. *Sowinski v. Walker*, 198 P.3d 1134, 1154 (Alaska 2008). The Court must "determine whether a duty is imposed by statute, regulation, . . . or existing case law." *McGrew v. Dep't Health & Soc. Servs.*, 106 P.3d 319, 322 (Alaska 2005). In this case, Alaska's common law of premises liability—"a general rule of negligence"—applies. *Id.* at 569-70.

5. Alaska law imposes a duty on land occupiers to maintain premises "in a reasonably safe condition in view of the circumstances, including the likelihood of injury to

others, the seriousness of the injury, and the burden of the respective parties of avoiding the risk." *Burnett v. Covell,* 191 P.3d 985, 990 (Alaska 2008) (citing *Webb v. City & Borough of Sitka*, 561 P.2d 731, 733 (Alaska 1997) *superseded on other grounds by* Alaska Stat. § 09.65.200, as recognized in *Univ. of Alaska v. Shanti*, 835 P.2d 1225, 1228 n.5 (Alaska 1992)).

6. Anchorage Municipal Code's provisions on snow and ice removal may inform the standard of care, but do not create a cause of action. *Seville v. Holland Am. Line Westours, Inc.*, 977 P.2d 103, 108 (Alaska 1999) (declining to recognize any actionable duty to protect members of the public from snow and ice under Anchorage Municipal Code § 24.80.090 or any cause of action for pedestrians injured by slipping on public sidewalks); *see also Burke v. Columbia Lumber Co. of Alaska*, 108 F. Supp. 743, 744 (D. Alaska 1952) (describing a similar ordinance from Sitka, Alaska, and holding that "this ordinance was not designed to g[i]ve an injured individual a right of action against a property owner violating its provisions, but rather was intended to assist the city in performing its municipal duties"); Anchorage Municipal Code § 24.80.110 (describing penalties for violation of § 24.80.90, not including a private cause of action).

7. The relevant portion of section 24.80.090 of the Anchorage Municipal Code reads as follows:

> A. An occupant of land . . . which is adjacent to a public sidewalk shall be responsible for . . . the removal or treatment of any ice that may accumulate, form or be deposited thereon.
>
> B. Between the hours of 8:00 a.m. and 6:00 p.m., it shall be unlawful for any occupant [entitled to possession or control] of land . . . to fail to remove or treat any accumulation of ice from all . . . adjacent sidewalks.
>
> C. For purposes of this section . . . any accumulation of ice of one inch or more, or any combination thereof to a depth of two inches or more, or any accumulation of untreated ice at any point on a public sidewalk . . . , shall create a rebuttable presumption that the occupant has violated this section.

Anchorage Municipal Code § 24.80.090.

8. The word "treat" in section 24.80.090(B) is defined as "the placement of salt, sand, sawdust, cinders or similar material designed to reduce or eliminate hazards to pedestrian traffic from accumulations of ice on public sidewalks." *Id.* § 24.80.100. The Code further states that "[t]reatment of ice shall be deemed accomplished only if such treatment is sufficient to allow a reasonably prudent pedestrian to walk safely over the ice." *Id.* If ice does accumulate to an extent that a reasonably prudent person cannot walk safely over it, there is "a rebuttable presumption that the ice has not been treated for purposes of section 24.80.090." *Id.*

9. The "precise scope" of USPS's duty or whether breach occurred is a question of fact. *Guerrero ex rel. Guerrero v. Alaska Housing Fin. Corp.*, 6 P.3d 250, 257 (Alaska 2000) (citing *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203 (Alaska 1998)).

10. To establish breach, plaintiffs must allege specific facts to "show that dangerous conditions existed on the property and that the property owner did not use due care to guard against unreasonable risks posed by these dangerous conditions." *Burnett*, 191 P.3d at 989.

**B.     Causation**

11. As with breach, causation is a "[f]act-intensive inquir[y]." *Guerrero*, 6 P.3d at 255 (citation omitted). "Alaska applies a two-part test of legal causation in negligence cases." *Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838, 841 (Alaska 2001). A plaintiff must show that the defendant's negligence was a cause in fact and a proximate cause of their injury. *Maddox v. River & Sea Marine, Inc.*, 925 P.2d 1033, 1039 (Alaska 1996).

12. Cause in fact requires "that the accident would not have happened 'but for' the defendant's negligence." *Id.*

13. Proximate cause requires that "the negligent act was, more likely than not, a substantial factor in bringing about the injury." *Alvey v. Pioneer Oilfeild Servs., Inc.*, 648 P.2d 599, 600 (Alaska 1982) (citing *Sharp v. Fairbanks N. Star Borough*, 569

P.2d 178, 181 (Alaska 1977)). To constitute a substantial factor, "the negligent act must have been so important in bringing about the injury that a reasonable person would regard it as a cause and attach responsibility to it.'" *Maddox*, 925 P.2d at 1039. However, "even if specific actions are a substantial factor in producing injury, [t]he actor's conduct may be held not to be a legal cause of harm" if in hindsight, "it appears . . . highly extraordinary that [the defendant's negligence] should have brought about the harm." *Sharp*, 569 P.2d at 182 (citing Restatement (Second) of Torts § 435, cmt. c (1965)).

14. In other words, "proximate cause requires only that the general kind of harm be foreseeable." *Winschel v. Brown*, 171 P.3d 142, 146 (Alaska 2007). Such "foreseeability does not require an ability to predict precise actions and exact injuries." *P.G. v. Dep't of Health & Hum. Servs.*, 4 P.3d 326, 335 (Alaska 2000). Accordingly, even where a plaintiff's negligence contributes to their injury, "such intervention is not a superseding cause" and therefore, will not cut off a defendant's liability where the defendant's negligence "creates or increases the foreseeable risk of harm." *Osborne v. Russel*, 669 P.2d 550, 557 (Alaska 1983).

### C. Comparative Fault of Plaintiff

15. Particularly where both the plaintiff's and defendant's actions were a substantial factor in the plaintiff's injury, "[t]he issue of comparative negligence [is] closely tied to the issue of causation." *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1222 (Alaska 1998).

16. Alaska "employ[s] the pure system of comparative negligence." *Kaatz v. State* (*Kaatz I*), 540 P.2d 1037, 1049 (Alaska 1975). Under this system, "a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them." *Anchorage Indep. Sch. Dist. v. Stephens*, 370 P.2d 531, 533 (Alaska 1962). As such, a "[d]efendant's liability is limited by the percentage of fault attributable to [the p]laintiff's own negligence." *Bolt v. United States*, 652 F. Supp.

- 11 -
Case 3:23-cv-00002-GMS    Document 68    Filed 10/08/25    Page 11 of 20

2d 1010, 1022 (D. Alaska 2009). Even where the plaintiff bears the majority of the fault for their injuries, Alaska law "does not bar recovery." Alaska Stat. § 09.17.060.

17. When assessing a plaintiff's negligence, Alaska courts consider whether the plaintiff's injury resulted from "avoidable consequences." *Stephens*, 370 P.2d at 533. In other words, a plaintiff's recovery will be reduced where "[s]he, more than anyone else, had the best chance to ensure her safety" by taking "certain steps that could have prevented her injury." *Bolt*, 652 F. Supp. 2d at 1023.

18. If a plaintiff bears some fault for their injuries, the fact finder must apportion fault between the plaintiff and the defendant. Alaska Stat. § 09.17.080. "[T]he apportionment of percentages [of fault] is a question of fact, not law." *State v. Kaatz* (*Kaatz II*), 572 P.2d 775, 781 (Alaska 1977); Alaska Stat. § 09.17.080. When determining the percentage of fault, the Court will consider "both the nature of the conduct of each person at fault, and the extent of the causal relation between the conduct and the damages claimed." *Kaatz II*, 572 P.2d at 782.

19. In *Bolt*, the court applied the "avoidable consequences" rule to find that a plaintiff who slipped and fell in the parking lot of her military housing unit was comparatively negligent and fifty percent responsible for her injuries. 652 F. Supp. 2d at 1011, 1023. Photographs clearly showed that "[t]he whole parking lot was a hazardous area" with ice that was "ubiquitous and unavoidable," with "a substantial layer of ice remaining on the ground . . . where [p]laintiff fell." *Id.* at 1022-23. "[T]he parking lot [did] not appear, on the whole," however, "to be any more dangerous than a typical parking lot . . . anywhere . . . in Alaska[] during wintertime." *Id.* at 1023. The *Bolt* plaintiff had only experienced three winters in Alaska, but "was very familiar with the area and with the conditions," and, further, "surely knew that the utmost caution must be taken while walking across an icy parking lot." *Id.* Although the fall would not have happened without the defendant's negligence failure to perform annual ice removal at the end of winter, the plaintiff "failed to take certain steps that could have prevented her injury, including walking more carefully, choosing a safer route, [and] wearing

better shoes." *Id.* The court reduced her damages accordingly. *Id.*

**D. Damages**

20. When apportioning damages based on fault, the Court will make specific factual findings as to (1) the amount of damages the plaintiff could recover if comparative fault was disregarded; (2) the percentage of fault allocated to each party. Alaska Stat. § 09.17.080.

21. The amount of damages without considering comparative fault reflects the general rule in tort cases is that "the injured party is entitled to be placed as nearly as possible in the position he [or she] would have occupied had it not been for the tortious conduct." *Weston v. AKHappytime, LLC*, 445 P.3d 1015, 1020 (Alaska 2019) (quoting *ERA Helicopters, Inc. v. Digicon Alaska, Inc.*, 518 P.2d 1057, 1059-60 (Alaska 1974)).

22. An injured plaintiff may recover both economic damages—including medical expenses—and non-economic damages. Alaska Stat. § 09.17.010(a). Plaintiff has the burden of "providing some reasonable basis upon which" the fact finder can "estimate with a fair degree of certainty the probable loss" and make "an intelligent determination of the extent of this loss." *Weston*, 445 P.3d at 1021 (quoting *Alexander v. Dep't of Corr.*, 221 P.3d 321, 324 (Alaska, 2009)).

**1. Medical Economic Damages**

23. A plaintiff seeking economic damages for medical expenses must "show that the medical care was reasonably necessary and that it was necessary because of [defendant's] negligence." *Id.* (citing *Turner v. Mun. of Anchorage*, 171 P.3d 180, 185 (Alaska 2007) and *Pugliese v. Perdue*, 988 P.2d 557, 580 (Alaska 1999)) (footnotes omitted).

24. For future expenses, this includes proving, "to a reasonable probability," that the expenses will occur and the reasonable amount of such damages. *Alexander*, 221 P.3d at 325 (quoting *Pluid v. B.K.*, 948 P.2d 981, 984 (Alaska 1997)).

25. Alaska applies the "reasonable value" approach to medical damages, which allows

"an injured party . . . to introduce the full, undiscounted medical bills into evidence at trial." *Weston*, 445 P.3d at 1027. While the defense cannot introduce the amounts actually paid, it can (1) rebut the reasonableness of the billed amounts by cross-examining the plaintiff's witnesses or calling its own and (2) introduce evidence of non-collateral payments—payments from sources related "to a wrongdoer who is legally responsible for the injuries"—in order to reduce their liability. *Id.* at 1021; *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 790 (Alaska 1999) (citation omitted).

26. In comparative negligence cases, non-collateral payments made on a no-fault basis (i.e., not in anticipation of the defendant's potential liability), are subtracted from the total available damages before fault is allocated between the parties, such that "all negligent parties [are] responsible for their proportionate share of the harm." *Jackman v. Jewel Lake Villa One*, 170 P.3d 173, 179 & n.16 (Alaska 2007).

### 2. Non-Economic Damages & Damages Cap

27. Alaska law allows recovery of non-economic damages associated with a personal injury for "pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life, loss of consortium, and other nonpecuniary damage." Alaska Stat. § 09.17.010(a). A plaintiff's recovery for these damages, however, is limited to "$400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater." *Id.* § 09.17.010(b).

28. When considering non-economic damages, the "[C]ourt must . . . allocate fault before deciding whether a damages cap applies; if the allocation of fault results in an award below the statutory cap, the law requires no further reduction." *Kisling v. Grosz*, 565 P.3d 226, 227 (Alaska 2025); Alaska Stat. § 09.17.080.

### APPLICATION OF LAW TO FACT

**A.  USPS was negligent.**

1. By a preponderance of the evidence, Plaintiff has shown that USPS was negligent, meeting her burden to establish the elements of duty, breach, injury, and causation. The parties do not dispute the nature or extent of Plaintiff's injury. Nor do they

- 14 -
Case 3:23-cv-00002-GMS   Document 68   Filed 10/08/25   Page 14 of 20

dispute what duty USPS owed to Plaintiff. The remaining issues of (1) breach and (2) causation are discussed, in turn, below.

2. First, USPS breached its duty to maintain its premises in a reasonably safe condition. As discussed above, the Court finds that there was ice on the sidewalk when Plaintiff fell. It is foreseeable that any injury resulting from such a fall would be severe. In contrast, in view of all the circumstances—including a lack of winter maintenance and Anchorage's weather in the days surrounding Plaintiff's fall—USPS's burden to make the sidewalk reasonably safe by effectively treating the ice was low.

3. As to the lack of effective winter maintenance, there is no entry for the use of ice melt product in USPS's maintenance log for the weeks leading up to Plaintiff's injury. Even assuming that the residue on the sidewalk is evidence of a recent attempt to treat, the persistence of ice shows that such treatment was ineffective, as acknowledged by the government's engineering expert. While the Anchorage Municipal Code is not binding here, it does state that ice in Anchorage is presumptively considered untreated if a reasonably prudent pedestrian could not walk safely *over* the ice. Indeed, Spradling testified that she would have put down more ice melt product.

4. Further, given the temperatures in the days leading up to Plaintiff's injury, it is likely that the ice was present on the sidewalk from the early morning of the previous day, when the temperatures dropped below freezing, to the time of Plaintiff's fall, around 4:30 PM. The Anchorage Municipal Code highlights that the treatment of ice is especially important between the hours of 8:00 AM and 6:00 PM, when pedestrians are most likely to encounter dangerous property conditions.

5. The Court does not hold that every instance of a patch of ice on a sidewalk will give rise to liability. Rather, the Court finds that allowing a patch of ice to persist on the sidewalk amounts to a breach of duty when the ice exists in an area important for pedestrian traffic in and out of the post office; for a period of approximately two days, including during the post office's business hours; under weather conditions that were conducive to maintenance, with no additional accumulation of snow or ice; and when

treatment was attempted but ineffective so that the sidewalk remained slick.

6. As the parties have acknowledged, ice is a fact of life in Alaska. Though the mere presence of ice does not necessarily amount to breach during an Alaska winter, USPS had ample opportunity to address the risk posed by the ice and should have removed it or treated it to render the remaining ice reasonably safe. While it may, at times, be impossible to remove or treat ice, USPS was not faced with such impossibility.

7. Accordingly, USPS breached its duty to Plaintiff by failing to act with due care to protect her from the unreasonable risk posed by this dangerous condition.

8. Second, USPS's breach was a cause in fact and a proximate cause of Plaintiff's injuries. As to actual cause, Plaintiff would not have slipped and fallen but for the sidewalk's condition, making USPS's ineffective treatment of the ice a cause in fact of Plaintiff's wrist fractures and trigger finger. Although Dr. Milam gave no opinion on whether Plaintiff's fractures caused her trigger finger, the government's expert, Dr. Schroeder, reported that the fractures were in fact the substantial cause of the condition. Given Dr. Schroeder's opinion, the severity of Plaintiff's wrist fractures, and the association between Plaintiff's swelling at the time of fracture and the recurrent inflammation in her hands, the Court finds that USPS's negligence was also a cause in fact of Plaintiff's trigger finger.

9. As to proximate cause, USPS's ineffective treatment of the ice was a substantial factor in bringing about Plaintiff's fractures and trigger finger, such that a reasonable person would regard it as a cause and a basis to attach liability. Although the likelihood of injury posed by the ice was not high, the kind of harm that Plaintiff ultimately suffered was foreseeable. Allowing slick ice to remain on the sidewalk, which post office patrons cross over every day, poses a clear risk of a slip and fall injury. Any person who slips and falls is likely to instinctively try to catch themselves, and in doing so injure their hands or wrists. Injury to her hands and wrists is exactly what Plaintiff suffered.

10. Though Plaintiff's trigger finger is unusual, proximate cause does not require that the

- 16 -
Case 3:23-cv-00002-GMS     Document 68     Filed 10/08/25     Page 16 of 20

exact injury or extent of injuries be predictable; it merely requires that the type of harm be *foreseeable*. And in cases of severe injury, long-term complications are foreseeable. USPS's negligence was therefore a proximate cause of Plaintiff's wrist fractures and her trigger finger syndrome.

11. The government argues that Plaintiff's negligence was a superseding cause of her injury, cutting off USPS's liability. However, even when a plaintiff is negligent, a defendant's negligence is still a proximate cause if it increased the risk of a foreseeable harm to the plaintiff. Such is the case here. It is not highly extraordinary that USPS's failure to treat the ice on its sidewalk created a risk of harm for reasonably prudent pedestrians and increased the risk of a slip and fall injury for negligent pedestrians.

12. Because the Court finds that USPS's ineffective winter maintenance was both the cause in fact and the proximate cause of Plaintiff's injuries, the government's arguments regarding Plaintiff's responsibility for her fall are more properly considered in the related discussion of comparative fault below.

13. In sum, Plaintiff has met her burden of proof as to each element of her negligence claim and the Court holds that USPS was negligent.

### B. Plaintiff bears eighty percent of the fault for her injuries.

14. As a preliminary matter, the Court holds that Plaintiff's injuries resulted, in substantial part, from her own fault. Accordingly, the Court must compare her negligence to that of USPS to allocate fault between the parties.

15. First, USPS was negligent, but at the point of the accident, its negligence amounted to a narrow strip of ice on a predominately clear sidewalk. There was a wide dry area that provided ample walking space. Further, for an average Alaskan visiting this post office, the ice that was present on the day of Plaintiff's injury would be easily observed and avoided. And in winter conditions including temperatures of twelve- to thirteen-degrees, an average Alaskan would wear winter boots with traction which would substantially reduce the risk of injury.

16. A comparison of USPS's negligence to that of the defendant in *Bolt*, described above, is illuminating. Where the *Bolt* defendant left ice covering an entire parking lot of a residential building for a period of months, to the extent that hazard became ubiquitous and unavoidable for the residents of that building, USPS merely left a small strip of ice stand for a period of days on an otherwise dry sidewalk. In *Bolt*, the duration and scope of the hazard and the utter lack of ice-free paths for pedestrians posed a greater risk of severe injury than the patch of ice left by USPS.

17. Second, Plaintiff has lived in Alaska for her entire life and is familiar with Alaska winters. She knows that she should wear proper winter shoes, watch where she walks, and proceed carefully in winter conditions. Her conduct while walking through the parking lot "like a penguin" shows that she understands the risks of injury posed by winter conditions. That she neglected to consider those risks once she reached the sidewalk is, itself, negligent.

18. As Plaintiff, her sister, and her brother-in-law each testified, Plaintiff could easily have walked around the patches of ice. In fact, Plaintiff testified that if she had been looking where she was walking, she would have chosen the dry path and that, in doing so, would have avoided injury.

19. Again, comparison to *Bolt* is helpful. The *Bolt* court charged the plaintiff with knowledge that she should have taken due care to navigate the icy surfaces, despite the plaintiff only living in Alaska for three winters. The *Bolt* plaintiff was very familiar with the area where she fell and could have avoided her injury by walking more carefully, choosing a safer route, and wearing appropriate winter shoes. The same is true for Plaintiff here, who has far more than three Alaska winters under her belt and had been visiting this post office twice a week for over a decade. Further, unlike the *Bolt* plaintiff, Plaintiff here was not forced to choose amongst a set of dangerous icy paths. She needed only pay attention to where she was walking, and she could easily have avoided the ice altogether.

20. Given the ease with which Plaintiff could have avoided the ice, and the depth of

Plaintiff's knowledge of both the risks posed by Alaska winters and how one should act to avoid those risks, the Court finds that Plaintiff was eighty percent at fault for her injuries. USPS bears twenty percent of the fault.

### C. Plaintiff is entitled to $119,074.55 in damages.

21. Under Alaska's system of pure comparative negligence, Plaintiff is entitled to recover only the portion of her damages for which USPS is responsible. Reflecting the above allocation of fault, Plaintiff's recovery will be reduced by eighty percent.

22. First, the Court finds that the total amount of available damages, including both economic and non-economic harms, is $595,372.76. This sum reflects the position that Plaintiff would have been in if not for her injuries and temporarily disregards comparative negligence.

23. For economic damages, Plaintiff seeks only medical expenses. The government did not dispute the necessity of Plaintiff's past medical treatments and presented no evidence to rebut the reasonableness of this expense; but as noted, the parties have stipulated that the $3,524.64 paid by IHS is a non-collateral payment so that the available economic damages for past medical expenses are reduced to $148,843.19.

24. In terms of future medical expenses, Plaintiff has not shown that she must undergo any medically necessary treatments associated with her injuries. Plaintiff's wrists have healed well, regaining strength and a full range of motion. Further, despite ongoing effects of trigger finger, any additional surgery to treat the condition would be elective. Indeed, Dr. Milam noted that the best path forward for Plaintiff would likely be rest and accommodation. The Court, therefore, finds no necessary future medical expenses.

25. To reflect Plaintiff's pain and suffering, including her loss of independence and ability to participate in her favorite hobbies, the Court finds available non-economic damages of $446,529.57.

26. Because Plaintiff bears eighty percent of the fault for her injuries, the government's liability is diminished such that she can recover only twenty percent of the available

damages. She can recover $29,768.64 in economic damages and $89,305.91 in non-economic damages, for a total of $119,074.55. Because the adjusted non-economic damages fall below the statutory cap there is no further reduction.

**CONCLUSION**

For the reasons stated above, the Court finds the United States liable under the FTCA for Plaintiff Darla Warnke's injuries but only twenty percent at fault. Plaintiff bears the remaining eighty percent of the fault. The Court will enter judgment in Plaintiff's favor with total damages of $119,074.55.

DATED this 8th day of October, 2025.

_G. Murray Snow_
G. Murray Snow
Senior United States District Judge